If I might begin my comments in addressing a couple of issues that I believe were not addressed as clearly as I might have intended in my briefing. In regards to the duty to intervene, I think the Ninth Circuit has stated four particular steps in the duty to intervene. One, that the vessel owner must know of the hazardous condition. Two, the vessel owner must realize, or should have realized, that the condition presented an unreasonable risk of harm. Three, the vessel owner should have known that the repair company would fail to remedy the situation. And four, that the vessel owner helped to create the hazard. In response to the first step, number one, the appellant contends that Bahia, through Dave Minor, the job superintendent and employee of the vessel owner, and Joe Dutra, the captain, knew of the hazardous condition as it was created, as the decking was removed, and as the scaffolding was not placed underneath. And I'll address that in a moment. Now, there's another employer here called BH? That's correct. It's a sister corporation under the Evans umbrella. It's a sister corporation to the Bahia Sternwheelers, Inc. Okay, but you're trying to hold Sternwheelers liable here. Correct. But you have to deal with BH? That's correct. All right. And I will, I think, in how I address this. Let me ask something. This may be in the record, but you could bring it to my attention again. Was this decking being removed, and that's what created the hole? I mean, it wasn't a hole. It already existed. It was being removed, and then that created the hole that became the dangerous situation. That's correct. The decking, after the Bahia Bell went in for a major renovation, the upper decking near the pilot house and the pilot house were both removed, leaving these holes exposed for some period of time, until my client and another employee from CLP, Contractors' Labor Pool, was then contacted by BH to come assist in doing some of the carpentry work. First to do some repair at the end of the Bahia Bell, and then Friday morning, the day of the fall, was then when they were assigned to go up to the upper deck and perform this work. And the work was part of what? The work was putting the deck back on? Putting the decking back on. That's correct. Counsel, could you go through each of these requirements and point us in the record to how each of these was satisfied? That's what I'm doing, Your Honor. May I just review, then, for the first step, knowing of the hazardous condition. Because Dave Minor, the job superintendent, for all of the work being performed on the Bahia Bell, who was an employee of Bahia Bell, was there on a daily basis. And because Joe Dutra, the captain, was there on a daily basis performing safety inspections and two or three times a week performing safety meetings, they What was the particular hazard that you're saying that they knew or should have known about? Falling from a height of greater than 10 feet in an unexposed area in the upper deck. Okay. The condition. It has to be a condition. Correct. What's the condition? The hazardous condition was created when the decking was removed. Initially, the entire decking and the beams were removed and new beams were put in place. The hazardous condition was created when the decking was removed and either no scaffolding was placed underneath at the request of the vessel owner or it was not addressed in the safety meetings that were conducted by the vessel owner. So this hazardous condition was created. Now, how do we know that from the record? Because in the record, it states that Joe Dutra, who was the captain of the vessel, conducted safety meetings. The expert, Morris Farkas, addressed that failure to address fall protection in the safety meetings created this hazardous condition, did not make them aware of what they were working on. But your burden is to show that the vessel knew or should know. That's right. And so you're saying the safety meetings, in the safety meetings, this should have been discussed? It should have been discussed. But they would have known, not necessarily, the vessel owner would have known, not necessarily in the safety meetings, but by its inspections in the Bueno case. Counsel, what's the impact of Peters, which I understand establishes that there should be no recovery if it's caused by the condition that the individuals were called in to repair? That's a case that your Honor addressed some time ago, over 20 years ago, I believe. That's right. Along with Bjornsson. Hasn't been overruled yet, as far as I know. No, it has not. You about to do that, Judge? Peters is different on its facts. So are all the cases that deal with repair. This is a case where we have a vessel owner who is serving as the general contractor. They have their job superintendent on site, Mr. Dave Minor. He is overall responsible for safety. Counsel. He has someone under him. Excuse me. I can't leave that. You're saying that the vessel owner was serving as the general contractor? Yes. They contracted with BH to do the carpentry. They contracted with Driscoll Boat Yards to do the repair work below the water line on the hull. So Bahia was the general contractor. Where is that in the record? The judge actually holds that the job superintendent for the entire work was Dave Minor. The judge does not hold that Bahia Bell served as the contractor, but that it's gleaned from the facts of who actually hired all of these subcontractors to do particulars on the repair work. The vessel owner also hired a rise scaffolding to erect scaffolding around the ship. But the vessel owner did not request that a rise scaffolding put scaffolding under the open deck area, which the expert testified would have been one of the manners to satisfy the need for fall protection. Just so I understand your argument, are you saying that there is nothing in the record specifically identifying Bahia as the general contractor, but you're extrapolating that from your interpretation of the facts? Yes. Is that what you're saying? Yes. And I think it's a very fair assumption. I'm not making any stretch of the imagination. Well, I'm sure opposing counsel will enlighten us as to its beyond it. The third prong, knowing whether Bahia should have known that the repair company would fail to remedy the situation, we have this open area open for some period of time, at least a week. In the Bueno case, it was only five hours. We then have people beginning to work Friday morning, starting work at 7 a.m., ending work at 11 a.m., and when they all break for lunch. We have a period of four hours when they're actually working on this open area. Joe Dutra and Dave Minor on site. Joe Dutra is conducting daily safety inspections of the vessel. He should have realized the safety precautions necessary regarding fall protection and working from a height exceeding 10 feet were not being met. I've already addressed the fourth prong on how Bahia helped create the hazard. They helped create the hazard by not requiring that a rise scaffolding place scaffolding under this deck, knowing that it was going to be exposed, or by addressing the issue in safety meetings. Counsel, is your argument consistent with Cyndia? Yes. Cyndia provides a framework, Your Honor, and it provides some parameters. But the Ninth Circuit has taken even one more step in addition to Cyndia, and that's the creation, whether the vessel owner helped create the hazard. I think we even meet that additional standard. I think what the judge, what Judge Lorenz was doing is he was really trying to pigeonhole everything into Cyndia, when this does not match Cyndia on its facts. It's more closely related to the Bueno and the Cook decision, both here within the Ninth Circuit, when we deal with a vessel owner that has assumed duties. Well, counsel, what do you make of the language in Cyndia that says that a vessel owner generally has no duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within operations that are assigned to the stevedore? That would be under a normal situation. However, this is not a normal situation in which you have a vessel owner that pulls up alongside docks and turns all the work over to the stevedore and for most intents and purposes is aside. It is simply on the ship and doesn't have anything to do with it. Here we have someone who, before the ship actually came in, contracted with Driscoll Boat Yards, contracted with BH, contracted with Araya Scaffolding and others to perform work. It's now in the dry dock. We have someone who was on the job site supervising the work, Mr. Dave Minor. We have a representative of the vessel, the captain, who was actually performing daily safety inspections, very much like the safety inspections performed by the government in the Bueno case. One of the changes that has occurred that was not noted in the briefs because of a change in California law is that as of January of 2000, OSHA regulations are admissible in third-party cases to determine liability. And that case is Elsner v. Uveges. I can get that cite for you, Mary. Is that a case that has not been cited in any brief? That's correct. All right. Please see the deputy clerk after the argument and give three copies of that citation. I can do that. What is the case you're citing now, counsel? It's 34 Cal 4th, 915, December 2004. And that case stands for what proposition? That OSHA regulations are admissible in third-party civil actions to determine the statutory conduct not only by the employer of the employee, but all other contractors on a multiple-employer work site, which this was. Counsel, why does that matter here if we have a specific statute which sets forth the liability for the vessel owner? Well, there's no statute that sets forth a liability. We have the Scindia case. But under contract, the customer, although the vessel owner cited in his brief that it's the employer who had the responsible, or responsibility to provide the safety equipment, the contract actually states it was the customer. Aren't we looking at the liability under LHWCA? 905B of Longstreet, 33 U.S.C. 905B, provides an avenue in which from the 1990s to 1972 amendments restricted what a longshoreman could, what kind of claim a longshoreman could bring against the vessel owner. However, it did not abrogate the vessel's duties when it involved negligence, especially when the vessel owner assumed duties it might not otherwise have under Scindia. In this case, the vessel assumed many duties which are not included in Scindia, which are not even approached in Scindia. But they are approached in the Bueno case, in the Cook case, when we deal with, when the vessel is assumed the duty to inspect, especially in regards to safety. And then in addition to what was performed in Bueno, in this case, the vessel owner conducted safety meetings, not just safety inspections, but safety meetings. And the uncontradicted testimony of the expert was that failure to address the fall protection in the safety meetings by Captain Dutra created, helped create this dangerous condition where employees were working at an unprotected height of 15 to 18 feet. How did the vessel owner help to create the undangerous condition in your view? First, because it contracted to have the scaffolding put around the vessel, and one of the avenues for preventing this kind of fall is to have erected scaffolding under the deck within two feet of the, under the exposed area. They did not do so. Likewise, by not addressing fall protection in the safety meetings, they helped create this hazardous condition. Is that created or not? I mean, it seems like it's already created. You're just saying they didn't come in and remedy it. Part of the creation is that the employees went up there without the proper equipment and without the proper warning of where they were going to be working and what the dangers were. So they were not mentally aware that this was something that they should have either had safety equipment, which was not provided to them, and to require either netting or scaffolding. What I was getting to is the creation. The creation is by removing the decking, you've now got a hole. That's correct. So when you say the vessel owner created it by not putting in scaffolds, that means he didn't remedy a problem as opposed to create it. That's, I can see your perspective. However, the dangerous condition doesn't just exist because there's an open hole. The dangerous condition really begins to exist because people are required to work around this open hole. And as soon as that, the workers around the open hole, when the two unite, that's then a dangerous condition. The owner didn't, the ship didn't create that. I mean, those workers were sent there by other people. I mean, if you're talking about they created the condition, I'm having some difficulty with, it seems to me everything you're saying is something that comes after the condition was created. In the case such as Peter's and we're dealing with repairs, the idea was that this was a dangerous condition that existed, and this is the condition that the repair person was coming to actually fix. That's not the situation here. Mr. Graham had no forewarning of what his work was going to be other than just general carpentry work. We have someone who was called in and initially for the first four days was working at the stern of the vessel replacing the siding. And it wasn't until the fifth day when his assignment changed and they said, go up on the upper deck. This condition, if you will, by not having the scaffolding underneath and then sending someone up to work at an unprotected height, that is when the dangerous condition comes into existence. I'm not arguing with that, but it seems to me that's not created by the vessel owner, neither one of those things. The vessel owner is the one who coordinated the work. In other words, remove this, take off the decking and didn't put up the scaffolding underneath created that dangerous condition. As the uncontradictive expert testimony is, that by not having, by not addressing the fall protection prior to them going up to work also created a hazardous condition where they were going up unawares of what fall protection they should be taking in order to work at that unprotected height on that leading edge without appropriate fall protection. I'd like to reserve the rest of my time. Thank you, Mr. D'Amico. Thank you. We'll hear from the sternwheeler. Good morning, Your Honors. My name is Bill Hughes. I'm representing the sternwheelers, the vessel owner. At the outset, let me outline a couple of things that I'd like to discuss. One, the vessel owner in this case, it does not follow they were the general contractor. Judge Lorenz found, and I believe correctly so, that BH partnership was akin to an independent contractor, but that's what every stevedore or repair company that works on a boat or a ship is. We have a very clear body of law that we're dealing with here that has been around for a long time. For a while. And something interesting I noted when I looked at who the judges were in addition to Justice O'Scanlan in the Peters case, the Cynthia case was delivered by Justice Byron White in 1981, and that sorted out the 1972 amendments to the Longshore Workers' Compact, which I won't burden the record with here because I'm sure the courts were aware of what happened then, but the courts were sorting out what those amendments meant for nine years until Cynthia came along in 1981, and Justice White and the Supreme Court spelled it out so well that it's still very applicable today. Seventeen years later, 1998, the Ninth Circuit Court of Appeals in the Clevedo case interpreted and applied Cynthia, and this is what I found very interesting. The justice who delivered the opinion of the Clevedo court was none other than Byron White, retired Supreme Court justice sitting by designation. And the Clevedo court adhered to Cynthia. In fact, if you apply the Clevedo court to the facts here, we win. The Clevedo court even mentioned an additional element of the turnover duty that Cynthia did not spell out, and that is that the vessel owner must have created the hazard. So to go through the very outline of facts here, the hazard or the condition of the turnover duty or the duty to intervene. Excuse me. Duty to intervene. I misspoke. Thank you very much, Justice Ronaldson. I'm a little excited up here this morning. The hazard was, and it's uncontradicted in the record, was created after the vessel was turned over. The decking was removed by BH, and BH's job was to put boards on top of it and fix it up. The very condition that Mr. Graham was hired to repair is the condition that resulted in his accident. And the district court really considered the facts, and what really we told the district court in opening argument that this was a no-win situation for Graham, because if Graham was the special employee of Sternwheelers, the vessel owner, then his action would have been barred by 905B, just from the plain language of the statute. And Mr. Winter then was faced a dilemma. Does he try to prove that Sternwheelers had sufficient control over Graham to show that perhaps syndia duties were not met? Or does he show that they did not have control, that, in fact, BH was the special employer and had control? And Justice Judge Lorenz found that BH had exclusive control of the upper deck area and the project. And that's in paragraphs 10, 16, 24 of the decision, the findings of the fact and conclusions of law. Counsel, what's your response to opposing counsel's argument that this case is different because the vessel owner's representatives were there at the safety meetings and had daily inspections? Well, we have to look at the record, Your Honor. And the record is that Dutra, the captain, not every day, but he did his inspections and he had meetings. BH as well had daily meetings, and they were in exclusive control of this particular area of the vessel. The court recognized this and made a finding that, based on the record, Bahia did not take over the statutory duty of providing safety equipment. That's in paragraph 30 of the findings of fact and conclusions of law. If I might digress for a moment, Mr. Winter, when he recited the duty to intervene elements, I think he misstated number three. My notes tell me that he said that the vessel owner knew or should have known that the employer of the injured party did not undertake adequate safety precautions. In fact, the rule is that the vessel owner must have actual knowledge of the condition, should realize that there's an unreasonable risk of harm as a result of the condition, must know that the employer, as a result of obviously improvident judgment, has failed to remedy the condition. Doesn't Cindy say should know? No one should know. I've read a bunch of cases, and the case that I picked for my outline today says no, not should know. Now, it's true that there are some standards in one of the other duties. Perhaps the turnover duty, there is a knew or should have known of a latent hazard, but that doesn't apply here unless the Court has some questions about that. I'm proceeding under the impression that the turnover duty is out, that the active involvement duty is out, that the active control duty is out, and that all we're dealing with now is the duty to intervene. As far as the record goes, too, in terms of what did Stern-Wheelers know, it's silent. Dutra, Captain Dutra wasn't asked what he knew. Dave Minor wasn't even at the trial. He was a former employee who was not available to testify in deposition or at trial. So there's no evidence. If we look at the elements of this duty to intervene, there's no evidence that the fall protection precautions BH was taking. And the district court found that this was BH's job. Counsel, I'm looking at page 750 of our Torres case. Yes. And it says a vessel has a duty to intervene when the vessel knows or should know of the condition, realizes or should realize the condition presents an unreasonable risk of harm, and knows or should know that the stevedore has failed to remedy the situation. Okay. So does that change your argument? No. No, not at all. First of all, let's talk about the appreciable risk of harm, Your Honor. The witness himself was asked, do a job like this at elevations before? Yes. His co-worker, yes. Do you ever use fall protection for anything like this? No. And no were the answers for both. In fact, they found it would be impractical. There would be a risk-benefit analysis here. There would be things to trip over if they had harnesses on. The BH superintendents, Farley and Speets, said that in their experience, they thought it would be impractical as well to use fall protection for this particular job, which brings us to the point of deferring to the finder of fact. Did the finder of fact make a clearly erroneous decision by making a finding that there was no reason to find that there's a reasonable appreciation of a problem here in the first instance? A problem, by the way, that as I go back to the Peters case, a problem that this plaintiff appellant was hired to fix the hole in the deck. So there are a lot of reasons why, if we apply the clearly erroneous standard, which I submit that we ought to, that this record has substantial evidence to support the first finding. Counsel, what do you make of the district court's finding that Miner, who was a Bahia employee, was ultimately responsible for all the work done on the boat? What's the significance of that finding? Well, I think if we put it in context here, we look at the area in question. Now, in the real world, the vessel owner is ultimately responsible for everything. I mean, if we go back to just the axioms of the Navy, I mean, whether the captain's on the bridge or not, if there's a problem, if it's in the middle of the night and the vessel has a collision and he's asleep, he's ultimately responsible for it. And the – I think there's a line of cases that just generally recognize that overall responsibility in the broad picture, you have to ratchet it down a little bit more under CINDIA and look at who actually has exclusive control of the area in question, whether it's a cargo operation, whether it's a repair operation. And there was evidence. There was the trial. We're not dealing with summary judgment here. We did have the trial. And the Court balanced the evidence and made a finding with very strong language that BH had exclusive control, that BH – and the Court did make the finding that Miner did have overall responsibility for safety, but the Court also made a finding that BH was also responsible for safety. And are those inconsistent findings for purposes of determining liability under the Longshoremen's Act? I think not, Your Honor. I think what we're looking at here are – is the Court addressing some arguments that were made by counsel, but making a specific finding that, yes, Miner was overall in charge, but BH, if we look at that upper deck area, this was BH's project. They had exclusive control. They were in charge of that in all respects, including safety. So you're looking at it as an umbrella over all Miner was in charge, but then you go down to the specific danger that's claimed in this case, and you're analyzing it that way? I think that's what the Court did here. And I think if you take a look or analyze any decision, the stevedores in a cargo operation don't have control of the entire vessel. They have control over the deck area where the cargo is being loaded or unloaded. And that's really what the whole focus of the analysis is. The syndia court, I think, made some very compelling comments. I don't want to interrupt you, sir. I'm just trying to follow something that Judge Rawlinson was asking about. It seems to me that what you may be saying is that if the shipowner has overall responsibility, that duties come with that. I mean, I assume they do. And one of those duties was they had some safety responsibility and exercise some of it. So if that's true, at least the Court's finding that there was no duty may be wrong. But it may be, and I might be wrong in the way I'm analyzing this, but it may be that that duty, the Court was saying, was ultimately subsumed by B.H.'s taking over the safety. Otherwise, the finding there's no duty as a matter of law is troubling if they have taken over a duty. Well, we're looking, of course, we're not, we're in the admiralty, in an admiralty court today. What we have is not land-based negligence duties, but we have the general maritime laws as articulated by the Supreme Court and the other federal courts. And what the Syndia Court tried to do and accomplished, and this has been recognized by Quvedo and other courts, is it does not want to have the negligence standard saddle the vessel with the doctrine of unseaworthiness. That was wiped out by the 72 amendments. And the purpose of the interpretation of the Syndia duties was to put the responsibility and costs on the party who is in the best position to avoid an accident. And that would be the stevedore with active control over the job in question. Some courts have said to do otherwise. To saddle the vessel owner with negligence in a situation that goes outside of the Syndia standards would be to place the party who is least in a position to prevent an accident. Why is that true in this case where the courts found that that's not the situation, that the owner has taken some active bull in, go off and go fishing while it was being fixed? They had somebody there and they did inspections and they say that Mr. Meyer was in overall control of the job. So that he could have said, in your safety meetings, you're not addressing the safety concerns that exist on this vessel, and I want you to do that. Or he could say he delegated that to VH. But if he was in that position, why didn't he have a duty to do something? Or do we find he had no duty? It seems to me it's a duty issue. It is a duty issue. And the duties are, in this case, the duty is to give the duty to intervene. Was that there? And the answer, based on the factual findings that were made, is no. And those factual findings have been recited in the findings of fact and conclusion of law, and I've touched on a few of them. See, here's the no-win dilemma. If the Court had looked at the evidence and said, you know, you're right, Mr. Winter, Dutra and Meyer, they were pulling the strings here. They oversaw this safety issue. They should have done this. They should have done that. They had control over what and how and when Graham was working. Then he would have found that the vessel owner was the special employer, and he would have found for the vessel owner, because of the statutory immunity of bringing the action against the vessel owner, if the vessel owner is the special employer of the repairman. Well, aren't there two different things? One is, how are you going to do the work? And that might be BH is telling them, you're going to go up and you go up here and you're going to use these nails and so forth and so on. And the other is that the owner has taken some responsibility over safety. Maybe they didn't have to do it, but they did. And they're directing the work and they're now conducting safety meetings. Maybe you could say even if they conducted a terrible safety meeting, they had no duty to conduct a good one, or if they took over some responsibility for safety, then it seems to me they'd have a duty to do that in a manner that was reasonable. But here are the facts. This was a short trial, a few days. I couldn't hear you. It was a short trial. It was a two-day trial, so the record's not that long. But there were safety meetings that Dutra, the captain, really had nothing to do while the vessel's in dry dock other than make his appearance and walk around perhaps and have some meetings. He had meetings not every day. And the BH people were invited but not required to attend those. But the BH people had their own meetings every day. And what's the purpose of his meeting? Dutra's? Yeah. The record's pretty silent on that. Well, I mean, either he was just meeting with himself, you know, to call a safety meeting, or he was doing something with somebody that was working there. No, the record, Dutra was not on the stand very, very long. The focus was not the way the case was tried by plaintiff's counsel. It was really not on Dutra. So Dutra and Minor really were footnotes to the whole thing. Minor didn't testify. Dutra testified just for a few minutes. So the record really doesn't really get into that, other than there were safety meetings that Dutra had that weren't as frequent as BH's. But the Court weighed all that and found that the BH undertook the responsibility of safety for this particular part of the project. Before my time runs out, OSHA. We had a motion in limine that was granted in the case where we moved and the Court agreed with us that OSHA regulations don't apply to this case. And that wasn't part of the appeal. So I would say I would submit that this new case that, frankly, I haven't even read doesn't apply. I'm running out of time. I'll be glad to entertain any questions the Court may have. Where is that motion in limine? Where is that in the record, the granting of the motion in limine? It should. In the record. Good question. I mean, presumably it's in the transcript or it's in the record there. But there was a motion in limine granted and there was no appeal. Thank you, counsel. Thank you very much, Your Honor. I appreciate it. Mr. Winner, you have some reserve time. Yes, thank you. If I may just sort of pick up on one of the issues that Mr. Hughes had. One thing that's bothering me is what is your view with respect to these findings of fact? Do you agree it's clearly erroneous standard of view? If it were truly a findings of fact, but I think we're dealing with whether there was a duty to intervene. And what happens, I think, in most of these cases is the extent of the duty. Okay. But I mean, with respect to the specific findings of fact that are in this record. Yes. What's your view in terms of our standard of view? It's de novo, simply because I don't think that the trial court extended the duty to intervene sufficiently. I think he limited it to Syndia rather than taking it through the eyes of Boino and Cook, where we now have someone who's assumed a duty to inspect. But, counsel, let me just ask you this. If the court may define me that Farley visited the site at least once a day, Monday through Friday, to check on the work. Yes. That's not an extension of anything. There's no legal analysis. Now, if we were reviewing that fact, what would our standard of review be? Clearly erroneous. Okay. All right. But since I think that we're dealing with a duty issue, the duty to intervene. You're talking about the application of the law to those facts. That's right. Okay. And I don't think that he adopted Boino and Cook, even though he addressed even though he listed the Boino facts in his order, he did not truly address them. He did the others, but he did not address Boino. As Mr. Hughes pointed out, who was in the best position to remedy it? It was Bahia. VH was simply there to conduct some minor carpentry work and possibly oversee some of the painting. Bahia was the one who was coordinating the work. What work was done in what order? Was the upper decking removed before the scaffolding was put up? He stated that Bahia had no reasonable appreciation of the danger, along with others. We have, and then he tried to restate what Mr. Dutra did or did not know, and if I may just quickly read. Mr. Dutra, and this is Excerpts of Record 96 through 104 of the Excerpts of Record, talks about Mr. Dutra's daily, periodic safety inspections. Daily or periodic? Periodically throughout the day were his terms. He also held safety meetings two or three times a week. He conducted them. He wasn't just a participant. He conducted them, and all were there who were from VH and from Bahia. He says you had training in safety. That he believed that Dave Minor was in charge of the dry docking contract between Bahia Sternwheelers and Driscoll Boatyard. He was the person in charge. Who had overall responsibility for safety? Mr. Dave Minor. Who conducted daily safety inspections and periodic safety meetings throughout the week? Mr. Joe Dutra, the captain of the vessel. I think there's some misleading here about exclusive control. The fact that VH was, as I think as Your Honor pointed out, in regards to directing the work and what nails and what boards and how to paint them and how to treat them, but as far as inspecting and overall responsibility for all work, that was Bahia, and he is not precluded by any kind of special employer doctrine in this situation. Counsel, just so we understand, I see that the finding was Dutra conducted walk-throughs of the vessel periodically throughout the day. Didn't use the phrase inspection, but it said walk-throughs. If you look at Mr. Dutra's, on the excerpts of record, how often would you conduct a safety walk-through during a renovation? I walked the vessel periodically throughout the day, and that's page 98 of the excerpts of record. Counsel, your time has expired. Thank you. Thank you very much. The case just argued will be submitted for decision, and we will hear arguments.
judges: O'scannlain, Rawlinson. Whaley